UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ROBERT VARKONYI,<br><br>     Plaintiff,<br><br>v.<br><br>UNITED LAUNCH ALLIANCE,<br>LLC,<br><br>     Defendant. | Case No. 2:23-cv-00359-SB-MRW<br><br>ORDER DENYING MOTION FOR<br>SUMMARY JUDGMENT [DKT.<br>NO. 54] |

When Defendant United Launch Alliance (ULA) implemented a company-wide COVID-19 vaccine mandate, it told its 2,900 employees that anyone with a sincere religious objection to the vaccine could individually apply for an exemption. But after it received 109 applications, ULA changed course, concluding that accommodating all of them would unduly burden the company. Plaintiff Robert Varkonyi, a former supervisor at ULA, was one of the 109 requestors. After his request was denied, ULA deemed him to have voluntarily resigned when he chose not to receive the COVID-19 vaccine. Varkonyi alleges that ULA's refusal to grant a religious exemption constitutes discrimination under Title VII of the Civil Rights Act of 1964. ULA now moves for summary judgment on Varkonyi's two remaining claims, primarily contending that providing religious exemptions would impose undue hardship. Dkt. No. 54. Because a reasonable jury could conclude that the cost of granting the exemptions does not constitute undue hardship, the Court denies the motion.

I.

The facts presented by the parties are not in dispute. *See* Dkt. No. 54-2, Joint Appendix of Facts (JAF) 1–122 (listing all facts as undisputed). ULA constructs and launches rockets for a variety of government customers, including NASA, the U.S. Space Force, and the National Reconnaissance Office (the NRO). JAF 1–2. ULA operates at six locations and employs approximately 2,900

employees.  JAF 9.  Much of ULA's work affects national security, and ULA
continued operating throughout the pandemic.  JAF 3.  From the beginning of the
pandemic until late 2021, ULA implemented several onsite safety measures,
including temperature checks, mask requirements, physical distancing, and
disinfection protocols.  JAF 21–22.  Over the same period, more than 300 ULA
employees reported confirmed COVID-19 infections, 14 were hospitalized, and 3
died.  JAF 24.  With between 130 and 150 employees out of work at any given
time due to infections and quarantines, ULA had lost 100,000 hours of work due to
COVID-19 by the end of 2021, costing the company $9.5 million.  JAF 25–27.
Concerned with the inefficacy of its prior measures and aware of rising cases from
the Delta variant of the virus, ULA began requiring all employees to be vaccinated
starting September 1, 2021.  JAF 28–31.  Employees who did not comply with the
policy would be deemed to have voluntarily resigned.  JAF 38.

     Around the same time, President Biden issued Executive Order 14042,
which directed federal agencies—who were ULA's customers—to require their
contractors to comply with guidance from the Safer Federal Workforce Task
Force, which in turn required government contractors like ULA to ensure that
every employee was fully vaccinated against COVID-19 unless legally entitled to a
disability or religious accommodation.  JAF 48–49.  One customer, the NRO,
directed ULA to submit any individual vaccine exemptions to the NRO for a
second layer of review, which caused ULA to be concerned about employee
privacy.  JAF 53–55.

     Varkonyi worked as a Quality Technical Support Leader, Level 4, at ULA's
Vandenberg Space Force base.  JAF 7, 10–11.  About 110 employees work for
ULA at the base.  JAF 7.  Varkonyi supervised approximately eight of those
employees.  JAF 12.  It is undisputed that Varkonyi was required to work in person
and to travel, and that he could not perform the majority of his job remotely.  JAF
14–17.  Varkonyi is a Christian who is morally opposed to abortion and objects to
the use of vaccines developed using aborted fetal cell lines.  JAF 57–58.  Based on
that conviction, Varkonyi submitted a request for a religious exemption from
ULA's vaccine requirement.  JAF 56.

     At first, ULA's vaccine requirement allowed individual employees to submit
requests for religious exemptions.  JAF 33.  But after it received 109 requests for
religious accommodation, ULA decided to deny them all.  JAF 46–47.  ULA
estimated that testing all employees would cost $25,000–35,000 per week to
implement nationwide, assuming ULA could even locate tests.  JAF 92.  In its

denial of Varkonyi's request (as in its other denials), ULA listed 11 reasons why the requested exemption would result in undue hardship to ULA:

(1)  the high volume of requests to accommodate that qualified under the sincerely held belief prong of the analysis;

(2)  the need to ensure a healthy and safe workplace;

(3)  the time, cost, and administrati[ve] burden associated with weekly testing;

(4)  potential issues with the availability of testing;

(5)  ULA's requirements as a federal government contractor, including NRO requirements to staff contracts with vaccinated workers;

(6)  the need to comply with strict contract requirements, including launch schedules[;]

(7)  the potential financial risks of failure to satisfy such requirements;

(8)  the nature of [ULA's] workplace and business, including the need for on-site work;

(9)  the need for employees to interact with others, travel, and access customer facilities, including federal facilities with strict access requirements;

(10) the number of prior COVID cases and quarantines at ULA, including multiple hospitalizations and deaths; and

(11) the presence of continued active COVID-19 cases and quarantines at ULA despite prior safety measures.

Dkt. No. 54-3, Joint Appendix of Evidence (JAE) at 100–01 (numbering added).[1]

ULA also created a separate process for requesting medical exemptions, which were evaluated by a different department.  JAF 34.  ULA received 162 medical accommodation requests and granted 3 permanent accommodations.  JAF 99.

---

[1] References to pages in the JAE refer to the page numbering preceded by "APPX".

Varkonyi appealed the denial of his exemption request.  JAF 111.  ULA denied his appeal based on the same undue hardship reasons.  JAF 112–13.  After receiving this decision, Varkonyi still declined to be vaccinated.  ULA deemed him to have voluntarily resigned on November 12, 2021.  JAF 114–15.  Varkonyi filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) the next month, JAE at 106–07, followed by this lawsuit, Dkt. No. 1.  His Second Amended Complaint (SAC) alleges three claims, Dkt. No. 35, the first of which the parties resolved by stipulation, Dkt. No. 53.  Varkonyi's two remaining claims are for two different theories of religious discrimination under Title VII of the Civil Rights Act of 1964:  failure to accommodate and disparate impact.  Dkt. No. 35 ¶¶ 43–57.  ULA moved for summary judgment on both claims, and the Court heard argument on January 12, 2024.  Dkt. No. 54.

## II.

Summary judgment is appropriate where the record, taken in the light most favorable to the opposing party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  The moving party has the initial burden of establishing that there are no disputed material facts.  *Id.* at 256.  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed."  Fed. R. Civ. P. 56(e).  Furthermore, "Rule 56[(a)] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court "may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  Arguments based on conjecture or unfounded belief do not raise a genuine issue of material fact.  Moreover, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *R.W. Beck & Assocs. v. City of Sitka*, 27 F.3d 1475, 1481 n.4 (9th Cir. 1994) (citing *Anderson*, 477 U.S. at 249).

4

III.

The Court begins with the failure-to-accommodate claim before addressing the disparate impact claim.

A.

Title VII requires an employer to make reasonable accommodation for an employee's religious belief, observance, or practice unless it cannot do so "without undue hardship."  42 U.S.C. § 2000e(j).  An employee bringing a Title VII claim for an employer's failure to accommodate makes his prima facie case by showing that:

(1)  he had a bona fide religious belief, the practice of which conflicts with an employment duty;

(2)  he informed his employer of the belief and conflict; and

(3)  the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement.

*Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004).  If an employee establishes these elements, the employer may rebut the prima facie case by showing that it could not accommodate the employee without an undue hardship. *Id.*

ULA argues that it is entitled to summary judgment on Varkonyi's accommodation claim for two independent reasons:  (1) Varkonyi's religious belief was not bona fide, and (2) ULA could not accommodate him without undue hardship.

1.

Sincerity of belief is "a question of fact."  *United States v. Seeger*, 380 U.S. 163, 185 (1965).  A court must make a sincerity inquiry with "a light touch, or judicial shyness," limited "almost exclusively [to] a credibility assessment." *Moussazadeh v. Texas Dep't of Crim. Just.*, 703 F.3d 781, 792 (5th Cir. 2012) (cleaned up).  "Repeatedly and in many different contexts, [the Supreme Court has] warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."  *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990).  A court generally may

5

not discount a plaintiff's religious belief based on the court's determination that the belief is inconsistent, unreasonable, or at odds with the beliefs of the plaintiff's co-religionists; what matters is whether the position is based on an honest conviction. *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981).

During the accommodation process, ULA expressly accepted that Varkonyi's religious belief was sincerely held.  JAE at 104.  Now, however, ULA contests this fact, contending that his lack of objection to other medications and vaccines developed using aborted fetal cell lines is inconsistent with his objection to the COVID-19 vaccine.  In support of this argument, ULA cites *Gardner-Alfred v. Federal Reserve Bank*, No. 22-cv-1585, 2023 WL 6214863 (S.D.N.Y. September 25, 2023), in which the district court granted summary judgment because it held that no reasonable juror could find the plaintiff's asserted religious belief was bona fide.  The plaintiff in that case had paid $487 to purchase a "vaccination exemption package" from the "Temple of the Healing Spirit," which offered the same package for sale to any member of the public.  *Id*. at *15.  She provided no evidence that she had held her purported religious convictions before the eve of the vaccine policy at issue in that case.  In addition, despite her asserted objection to "invasive" "Western" medical procedures, she voluntarily chose to undergo several invasive Western medical procedures both before and after she requested an accommodation.  *Id*. at *16.  *Gardner-Alfred* is therefore distinguishable:  Varkonyi undisputedly did not develop his religious beliefs on the eve of his employer's vaccination policy; and while he previously had taken other vaccines and medications developed with aborted fetal cell lines, he purportedly was unaware of this fact at the time.  JAF 62–63, 66–67.

On this record, a reasonable juror could find Varkonyi's religious beliefs to be sincerely held.

## 2.

Because a jury could find that Varkonyi requested a religious accommodation based on a sincerely held religious belief, ULA's entitlement to summary judgment on the accommodation claim depends on proving that ULA could not accommodate Varkonyi without undue hardship.

Under Title VII, an employer is not required to accommodate an employee's religious observance, practice, or belief if it is unable to do so "without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).  The Supreme Court clarified the meaning of this clause in June of 2023 in *Groff v.*

*DeJoy*, 600 U.S. 447 (2023). *Groff* rejected a prior interpretation that construed "undue hardship" as anything "more than a de minimis" cost.[2] *Id.* at 467–68. Instead, the Court pointed out that "a hardship is more severe than a mere burden," and that "the modifier 'undue' means the requisite burden, privation, or adversity must rise to an 'excessive' or 'unjustifiable' level." *Id.* at 469. Thus, the Court held that an employer must show "that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 470. When applying this standard, courts must consider the practical impact of the requested accommodation "in light of the nature, size and operating cost of an employer." *Id.* at 470–71 (cleaned up). Where other accommodations are possible, an employer must not limit its analysis to the particular accommodation requested. *Id.* at 473.

The parties do not address in their briefing whether the Court should evaluate undue hardship on an individual or an aggregate basis. At the hearing, ULA argued that the Court should take into account the cost of accommodating all the requested religious exemptions because ULA denied Varkonyi's accommodation request as a result of a company-wide decision to not allow religious exemptions. Varkonyi replied that an individualized evaluation is required on a failure-to-accommodate claim, although he conceded that there are some hypothetical situations where it might make sense to evaluate the burden on an aggregate level.[3] The parties have not cited any authority addressing whether the relevant inquiry for undue hardship is the impact of granting Varkonyi's request in isolation or the impact of granting accommodations to all religious

---

[2] ULA seems to have relied on this pre-*Groff* standard in denying Varkonyi's request, stating in its appeal denial that accommodation is required "only if it would not cause an undue burden to the employer, which in this context means more than a minimal burden," and then describing how its reasons satisfy "the Title VII standard." JAE at 104.

[3] For example, if a company whose survival depends on weekend work has 100 similarly situated workers who sincerely object on religious grounds to working on weekends, it may be able to accommodate any one of them without hardship yet be unable to accommodate them all without going out of business. Absent a principled basis for distinguishing among the employees, it is not clear how the employer could avoid considering the aggregate impact of granting the requested accommodations.

objectors.  But the Court need not decide the issue because under either framing, ULA has not met its summary judgment burden.

In denying Varkonyi's request, ULA listed several reasons why granting an exemption from the vaccine mandate constituted an undue hardship.  JAE at 100–101 (original denial), 103–04 (appeal denial).  At summary judgment, ULA attempts to support those stated reasons with evidence that the previous policy of masking, temperature checks, and physical distancing was inadequate to prevent the spread of COVID-19; that tests were costly and limited in availability; and that the government required ULA to implement a vaccination policy and asked to review its exemptions.  JAF 24–29 (COVID-19 spreading despite previous measures), 91–92 (availability and cost of testing), 48–55 (vaccine requirements for government contractors).  But the problem with this evidence is that none of it demonstrates how much it would have cost ULA to accommodate Varkonyi—or even to accommodate *all* 109 religious objectors.

For example, to support ULA's contention that testing workers was infeasible because testing was expensive and tests were scarce at the time, ULA's deponent states that a nationwide testing program would have cost $25,000–$35,000 per week.  JAE at 130.  But that figure, which assumes testing of all employees, does not establish how much it would have cost to provide tests either to Varkonyi alone or to the 109 individuals who requested a religious exemption.  And the record indicates that ULA did, in fact, require and provide weekly testing for employees with medical exemptions, demonstrating ULA had options beyond testing everybody or testing nobody.  JAE at 125–26.

Similarly, ULA offers evidence that before the vaccination policy, its workforce experienced significant negative health effects even with preventative measures in place like masking and physical distancing.  Between 130 and 150 employees were on quarantine at any given time and, since the start of the pandemic, 14 employees were hospitalized and 3 died from COVID-19.  These numbers are evidence of the kinds of health effects that ULA might expect if it were to continue operating with no vaccinated workers.  But it does not follow that the same kinds of health effects would result if ULA were to operate with a workforce with a 96 percent vaccination rate,[4] much less if Varkonyi were the only

---

[4] ULA received 109 requests for religious exemptions out of a total workforce of approximately 2,900 employees, equivalent to 3.8 percent of its employees.  If ULA were to grant every exemption, it would thus operate with 96.2 percent of its workforce vaccinated.

exemption at issue.  ULA has provided nothing from which the Court can determine the negative health ramifications of 3.8 percent of employees remaining unvaccinated and taking other precautionary measures.

The same defect plagues ULA's argument that the past cost of employee quarantines "on its own constitutes an undue burden."  Dkt. No. 54-1 at 23.  ULA estimates that employee quarantines prior to the vaccination requirement cost it almost $9.5 million in total, with 130 to 150 employees quarantined at any given time.  But these costs were incurred during a period when none of ULA's employees were vaccinated.  ULA provides no evidence that the same costs would be incurred when operating at a 96 percent vaccination rate.

Likewise unsupported is ULA's contention that it could not accommodate Varkonyi because its customers' launch schedules cannot tolerate delays.  ULA provides no evidence that it ever missed a scheduled launch, even with 130 to 150 employees out on quarantine at any given time.  *See* JAE at 48 (describing ULA successfully avoiding launch schedule delays).  If it managed to operate without intolerable delays when no employees were vaccinated and 130 to 150 employees were out every week, it is not clear why it could not do so again with what presumably would be a lower quarantine rate when 96 percent of its employees are vaccinated.

ULA's argument that federal agency requirements prevented it from providing an accommodation fares no better.  ULA submits a copy of an executive order and corresponding Federal Task Force guidelines requiring ULA to implement a COVID vaccination policy and to certify to its governmental clients that all its employees are vaccinated.  JAE at 154–72.  One of its governmental clients, the National Reconnaissance Office, required that all individuals working on its projects be vaccinated.  JAE at 103–04.  But the requirements expressly contemplate that a government contractor "may be required to provide an accommodation to covered contractor employees who communicate to the covered contractor that they are not vaccinated against COVID-19 . . . because of a sincerely held religious belief, practice or observance."  JAE at 163.  Thus, a reasonable jury could find that the government's requirement that ULA implement a vaccination policy with religious exemptions did not preclude ULA from providing religious exemptions.[5]

---

[5] ULA separately asserts that NRO's requirement that ULA submit individual exemptions to it for additional review raised privacy concerns.  Dkt. No. 54-1 at

ULA also argues that allowing Varkonyi to work remotely was not an option because the majority of Varkonyi's job duties could not be done remotely, which Varkonyi does not dispute. Dkt. No. 54-1 at 23; JAF 17. But this argument misses the nature of the reasonable accommodation request: Varkonyi asked for a religious exemption from the vaccination requirement, not to work full-time remotely. If other accommodations were possible, ULA had a duty to consider them. *Groff*, 600 U.S. at 473.

In short, ULA's evidence of the burdens it anticipated is not tailored to Varkonyi's accommodation request. While ULA's evidence supports its decision to implement a vaccination policy in the first place and its argument that continuing to operate without any vaccinations would be an undue hardship, Varkonyi did not ask ULA to abandon its vaccination policy. He asked for an exemption. And ULA's evidence does not explain the hardship that would result from accommodating Varkonyi's exemption either in isolation or together with the 108 other requests. *Groff* requires this Court to evaluate the hardship imposed by a religious accommodation in light of the employer's nature, size, and operating costs. 600 U.S. at 470–71. Given the gaps in the evidentiary record—especially concerning the cost of accommodating the request—ULA has not shown that a reasonable jury must necessarily find that accommodating Varkonyi would impose undue hardship.

## B.

The Court next analyzes ULA's challenges to Varkonyi's disparate impact claim. ULA argues (1) that Varkonyi did not administratively exhaust his disparate impact claim in his underlying EEOC charge, (2) that he cannot show a significant disparate impact claim on a protected class, and (3) that ULA's policy was consistent with business necessity.

---

11. But ULA cites no authority suggesting that privacy concerns excuse an employer from complying with Title VII requests, and ULA does not explain why it decided its employees' purported privacy interests ought to trump their clearly asserted religious interests. The federal agency requirements thus do not establish as a matter of law that accommodating Varkonyi would be an undue burden.

1.

ULA argues that the Court "could" grant summary judgment on Varkonyi's disparate impact claim because Varkonyi's underlying EEOC charge does not "reflect such a claim." Dkt. No. 54-1 at 15.  ULA cites *Rodriguez v. Airborne Express*, 265 F.3d 890, 896–98 (9th Cir. 2001), a case applying state law in which the plaintiff was not allowed to allege in his lawsuit a new disability discrimination claim that was not part of the administrative charge he had filed two years prior. *Rodriguez* is distinguishable.  There, the plaintiff attempted to assert a claim for mental disability discrimination under California's Fair Employment and Housing Act against his employer, but the administrative charge he had filed years earlier asserted only ethnic discrimination.  *Id.* at 895–96.  The court held that because "[t]he two claims involve totally different kinds of allegedly improper conduct, and investigation into one claim would not likely lead to investigation of the other," the plaintiff had failed to administratively exhaust his claim for disability discrimination.  *Id.* at 898.

Varkonyi's disparate impact claim, in contrast, is not similarly distinct from his EEOC charge.  The EEOC charge asserted, "I believe I have been discriminated against due to my religion (Christian), in violation of Title VII of the Civil Rights Act of 1964," and "I believe that a class of individuals have been denied a religious accommodation because of their religion (Christian), in violation of Title VII of the Civil Rights Act of 1964."  JAE 106–07.  A claim for disparate impact is one type of cause of action for religious discrimination contemplated by Title VII.  *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015); 42 U.S.C. § 2000e-2(a).  Plaintiff's EEOC charge, which refers to religious discrimination in violation of Title VII, thus encompasses his disparate impact claim.

Accordingly, the Court rejects ULA's argument that it is entitled to summary judgment on exhaustion grounds.

2.

ULA next argues that it is entitled to summary judgment because Varkonyi has failed to show a disparate impact on a protected class, a required element of a prima facie case.  *Bolden-Hardge v. Off. of California State Controller*, 63 F.4th 1215, 1227 (9th Cir. 2023).  As framed by ULA, Varkonyi needed to show "that any employee without a religious objection to the vaccine requirement was

permitted to remain employed after refusing to take the vaccine." Dkt. No. 54-1 at 15.[6]

But that framing is incompatible with the Ninth Circuit's recent decision in *Bolden-Hardge*, in which it held that a Jehovah's Witness who was denied employment after refusing to take a loyalty oath had stated a claim for disparate impact because the policy obviously impacted Jehovah's Witnesses who shared the plaintiff's convictions. 63 F.4th at 1227–28. Under ULA's proffered standard, the plaintiff in *Bolden-Hardge* would have needed to show that a job applicant without a religious objection to the loyalty-oath requirement was hired despite refusing to take the oath. But *Bolden-Hardge* held that the disparate impact showing was satisfied where an employment requirement impacts "substantially all" religious adherents who share a plaintiff's religious beliefs by "making them feel they must choose between . . . employment and their religious beliefs." *Id.* at 1228. This choice, the court found, is a burden that not all employees face, and such a showing constitutes an "obvious" case in which a plaintiff need not support a disparate impact claim with statistics. *Id.*

ULA's vaccination requirement—absent any religious exemption—impacts substantially all employees who share Varkonyi's religious convictions[7] by presenting them with a choice not all employees face: violate your conscience or lose your job. Based on the number of applications ULA received, 109 individuals apparently felt they were faced with this choice. ULA has failed to establish that no reasonable factfinder could find a disparate impact on this record. Accordingly, the Court rejects ULA's argument for summary judgment on this ground.

3.

ULA's final argument on summary judgment is that ULA's denial of all religious exemptions to the vaccination policy was a business necessity, which is

---

[6] ULA's argument appears to fail even under its own framing because it allowed three employees to work after they refused vaccination for medical reasons. *Id.*; JAF 99.

[7] Varkonyi defines the disparate impact class as "any similarly situated religious individual who shares his religious beliefs," Dkt. No. 35 ¶ 47, and ULA does not appear to materially dispute this class definition, *see* Dkt. No. 54-1 at 15 (treating the class as "any employee with[] a religious objection"). The Court therefore accepts this definition of the relevant protected class for purposes of deciding this motion.

an affirmative defense to a disparate impact claim.  42 U.S.C. § 2000e-2(k)(1)(A)(i).  At the hearing, ULA's counsel stated its position that the standards for undue hardship and business necessity were "one and the same" for purposes of this motion.  Accordingly, the same genuine issues of material fact that preclude summary judgment on undue hardship likewise preclude summary judgment on business necessity.

IV.

The motion for summary judgment is DENIED.

Date: February 21, 2024

_____
Stanley Blumenfeld, Jr.
United States District Judge

13